Drake, Ch. J.,
dissenting :
The importance of the questions involved in the defendants7 motion for a new trial, constrains me to a somewhat full expression of the views which lead to my dissent from the conclusions announced by the majority of the court.
This motion requires the consideration and construction oí the second section of the “Aet to provide for appeals from the Court of Claims, and for other purposes,v approved June 25, 1868, (15 Stat. L., 75,) which is in these words :
“ That said Court of Claims, at any time while any suit or claim is pending before or on appeal from said court, or within two years next after the final disposition of any such suit or claim, may, on motion on behalf of the United States, grant a new trial in any such suit or claim and stay the payment of any judgment therein, upon such evidence (although the same may be cumulative or other) as shall reasonably satisfy said court that any fraud, wrong, or injustice in the premises has been done to the United States; but until an order is made staying the payment of a judgment, the same shall be payable and paid as now provided by law.”
This section makes inroads upon the common-law rules in regard to new trials in the following points:
1. While at the common law a motion fora new trial must be *337 made while the ease remains in the court where the trial was had, this section authorizes such a motion by the Government •after the case has been appealed to a higher jurisdiction.
2. It authorizes us, by granting anew trial, to oust the jurisdiction of the appellate court while the case is pending there; which that court very justly pronounced an anomaly. (United States v. Ayres, 9 Wall., 608.)
3. It authorizes us to grant a new trial oven after the Supreme Court has affirmed the judgment of this court; which, to the legal mind, is a greater anomaly.
4. While in common-law courts a motion fora new trial must be made during the term at which the trial was had, and within a prescribed number of days after the trial, a motion under this section may be made at any time within two years after the final disposition of the suit, whether that be by the judgment of this court unappealed from, or by the judgment of affirmance in the Supreme Court.
i>. The familiar and long-established rule of the common law, that a new trial wall not be granted on cumulative evidence, is .swept away, and upon such evidence wre may grant a new trial.
6. While at the common law the granting of a new trial rests ordinarily in the sound discretion of the court, the terms of this section leave us no such discretion, if we are, upon evidence, reasonably satisfied” as therein specified; for, though the language is that we “ may grant a new trial,” yet 1 cannot doubt that “ may,” there, was intended to mean shall, as it usually does in statutes, the object of which would, be defeated without that •construction. (Minor v. Mechanics’ Bank, 1 Peters, 46.) The object of this section would be, at least, constantly subject to ■defeat, if it would not be actually defeated, by holding it to be discretionary with us to grant anew trial or not where evidence is properly brought before ns sufficient to “ reasonably satisfy ” us “that fraud, wrong, or injustice in the premises has been done to the United States.”
This legislation contrasts strikingly with that regulating new trials in favor of claimants, which, in Beeson & Shaio’s Cases, (6. C. Ols. 11., 227,) this court held to apply, and which forbids a new'trial to a claimant, “ unless such reasons shall be pre•sented as, by the rules of the common law or chancery, in suits between individuals, would furnish sufficient ground for granting a new trial.” Thus the claimants are held to those rules, *338 while the Government prescribes for itself different ones. Legislation so unusual in making one law for claimants and another for the Government, the latter so unprecedented as to be justly styled an anomaly, must have a special and unusual intent as to the subject-matter and also as to this court, which the court should diligently seek to discover and carry out. I have very earnestly so sought, and will now proceed to state my views of the questions involved in this case.
In the first place, as to the subject-matter, the intent to throw the door wide open for the investigation, detection, and defeat of every kind, shade, and degree of “ fraud, wrong, or injustice-to the United States,” is manifest. And this is not only consistent with justice and right, but in consonance with, and furtherance of, previous legislation directed to the same end. The-eleventh section of the act of March 3,1863, (12 Stat. L., 765,), provides as follows:
“ That any person or persons who shall corruptly practice, or attempt to practice, any fraud against the United- States, in the proof, statement, establishment, or allowance of any claim, or any part of any claim, against the United States, shall ipso facto forfeit the. same to the Government; and it shall be the duty of the Court of Claims, in such cases, to find specifically that such fraud was practiced, or attempted to be practiced, and thereupon give judgment that such claim is forfeited to the-Government, and that the claimant be forever barred from prosecuting the same.”
Those two provisions indicate clearly to my mind the legislative conviction, that the Government would be in danger of suffering “ fraud, wrong, or injustice,” through the prosecution here of claims seemingly honest and just, but in fact fraudulent, wrongful, or unjust, the base character of which it would, in the nature of things, be difficult for the Government officers or the court to detect; and for the defeat of which enlarged time, increased opportunity, greater freedom of action, and unusual authority were demanded.
It is equally manifest to me from those sections, considered either together or apart, that the legislature intended to devolve upon this court, in an express and-special manner, the protection of the United States against “ fraud, wrong, and injustice,” and to clothe it with powers to that end. And it is a significant -and noteworthy -fact, that this peculiar legislation began *339 with the change in the character of this court which took place in March, 1863, under the act last cited. ' Prior to that time the court had no power to render judgments against the United States, but only to report upon claims to Congress• which revised its action, and paid the claim or not, as it saw fit. Simultaneously with the conferring of our present judicial powers, and the abandonment of direct congressional revision, the section last cited was enacted; designed, beyond doubt, to impose upon this court the duty (theretofore performed by the Congress itself) of guarding the Government against “ fraud in the proof, statement, establishment, or allowance of any claim.” As before remarked, the act of June 25,1868, was in furtherance of the purpose of the act of March 3,1863; and it laid upon this court the additional duty of protecting the Government (as the Congress had previously stood in a position to do) against“ wrong and injustice,” as well as fraud. No higher duty could be exacted of, no more eminent trust reposed by a government in, a judicial tribunal, than those laws exact from and repose in this court. Nor can be found elsewhere, so far as I know, such extraordinary and anomalous powers conferred upon a court as are therein delegated. To perform that duty and fulfill that trust the court is bound, regardless of interfering common law rules of practice. No such rule, as against that obligation, has, in my judgment, any force here.
These are my views of the general intent and purpose of the acts referred to, as to the subject-matter and as to this court. We will now look into the specific effect of the act of 1868 as our rule of action.
In the argument the claimant’s counsel cited, as the common law rules in regard to new trials for newly-discovered evidence, the following, viz: 1. That the evidence must be newly discovered. 2. That the party must show that he used due diligence to obtain the evidence before the trial. 3. That the evidence must, be relevant and material. 4. That the defense must be meritorious. 5. That the evidence must not be cumulative. 6. That the motion must be made in apt time.
The counsel admit that the fifth of these rules is superseded by the provisions of the act of 1868, and that the sixth is met, and the motion in “apt time.” Only the first four are claimed to have any bearing on this case.
As to the third and fourth, they are not peculiar to cases of *340 this description, but apply equally to all defenses and the evidence supporting them. The defense sought to be let in here would undoubtedly, if established, defeat -the claimant’s suit, and it is, therefore, meritorious. The evidence tends to support .that defense, and it is, therefore, relevant and material. The requirements of the third and fourth rules are therefore met. Only the first and second of those rules remain to bear upon the case. Let us examine their bearing.
In regard to the second, I deny its applicability to the Government; for, in my view, the question of diligence cannot be. raised against the Government in this case, if it ever can in any. To challenge the Government’s diligence necessarily includes judicial right to hold it guilty of laches. But the settled law, as declared in repeated decisions by the Supreme Court, is, that laches cannot be imputed to the Government on account of its officers. If, then, we cannot impute laches to the Government, we may not inquire whether it has used due diligence. This rule is, therefore, as effectually abrogated in favor of the Government as that in regard to cumulative evidence is abrogated by the act of 1868.
Under ordinary circumstances it would be sufficient merely to refer to those decisions, but I deem it proper, in this connection, to present them more extendedly. ”
The first case was that of United States v. Kirkpatrick, (9 Wheaton, 720.) This was an action by the United States against the sureties in the official bond of a collector'of taxes and duties; and the question was whether laches could he imputed to the Government from the delay'of the proper officers to call the collector to account at the periods provided by law, from the year 1814 to 1818. The law required them to do so, and further, required the Comptroller of the Treasury, in case any collector should fail to collect, or to render his account, or to pay over quarterly, or sooner if required, the moneys by him collected, immediately after such delinquency, to issue a warrant of distress against the delinquent collector, to be levied upon his personal estate; and in case that should prove insufficient to satisfy the warrant, then upon his real estate. The Comptroller neglected to perform those duties. Upon the bearing of this neglect upon the case, the court said: u As to the point of laches, we are of opinion that the charge of the court below, which supposes that laches will discharge the bond, cannot be *341 maintained as law. The general principle is that laches is not imputable to the Government, and this maxim is founded, not in the notion of extraordinary prerogative, but upon a great public policy. The Government can' transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would not save the public from the most serious losses if the doctrine of laches can be applied to its transactions. It would, in effect, work a repeal of all its securities. On the other hand, the mischiefs to the agents and their sureties would be scarcely less tolerable.”
In United States v. Vanzandt, (11 Wheaton, 184,) the suit was upon the official bond of a paymaster of the United States Army. The law made it the duty of- the paymaster to make report to the Pay master-General once in two months, showing the disposition of the funds previously transmitted, with accurate estimates for the next payment; and farther provided that “whenever any paymaster shall fail to transmit such estimate, or neglect to render his vouchers to the Paymaster-General for 'the settlement of his accounts, more than six months after receiving funds, ho shall be recalled and another appointed in his place.” The paymaster neglected, for a period of more than six months after receiving funds, to make report and estimates, and was not recalled; but, notwithstanding, additional funds were placed in his hands. It was contended by the sureties that the law left no discretion in the proper officer of the Government to continue the paymaster in office after his delinquency, but that he ceased thereafter to be paymaster, and the responsibility of his sureties was terminated. In reference to this position the court said:
“It must be conceded that the iujunction on the proper officer of the Government to recall the delinquent paymaster is expressed in very strong language; but whether .the omission to perform the act amounts, under every possible circumstance, to a breach of official duty may admit of some doubt. * * * The officer whose duty it may be to recall him, acts upon his own responsibility to the Government by declining to do so; but, until he acts otherwise, the paymaster is authorized, notwithstanding his delinquency, to receive and to disburse the funds which may be placed in his hands.
“The attempt to distinguish this from Kirkpatrick’s case is *342 made upon the ground that that was purely a case of laches; whereas, in this, an unauthorized act was done by the Government in confiding funds to the disposal of a public defaulter, whom the Government was bound by law to have dismissed from office. But will it be contended that the obligation to dismiss this officer was more imperative than that imposed upon the Comptroller to call the collector of direct taxes to account at the periods prescribed by law, and, in case of delinquency, to pursue the summary remedy which the same law provided for the safety of the public, and, consequently, for that of the surety % The neglect in the one case and in the other imputes laches to the officer whose duty it was to perform the acts which the law required; but, in a legal point of vieiv, the rights of the Government cannot be affected, by these laches.”
In United States v. Nicholl, (12 Wheaton, 505,) the court reaffirmed the doctrine declared in the cases of Kirkpatrick and Yanzandt, but without specifically applying it.
In Dox v. The Postmaster-General, (1 Peters, 318,) the question was again considered. This was an action against the sureties in the official bond of a postmaster. The defense set up was that the postmaster was removed from office on the 1st of July, 1816; that the Postmaster-General did not open an account against him, and make any claim and demand on him for the moneys received by him as postmaster until the 1st day of July, 1821; that at the time of his removal from office he was solvent and able to pay his debts, and continued so until the 1st day of July, 1819, after which he became insolvent and continued to be so; and that the Postmaster-General, well knowing that the postmaster had neglected and refused to pay over the moneys due from him at the end of every quarter, did not commence a suit until August, 1821.
“ These facts,” say the court, “ placed on the record, without explanation, must be admitted to show a gross neglect of duty on the part of the Postmaster-General. Does this neglect discharge the sureties from their obligations 1 The condition of the bond is broken, and the obligation has become absolute. Is the claim of the United States upon them released by the laches of the officer to whom the assertion of that claim was intrusted ? This question also has been settled in this court.”
The court then refer at length to the cases of Kirkpatrick and Yanzandt, and say, in conclusion:
*343 “ These two cases seem to fix the principle that the laches of the officers of the Government, however gross, do not of themselves discharge the sureties in an official bond from the obligation it creates, as firmly as the decisions of this court can fix it.”
Finally, in Gibbons v. United States, (8 Wallace, 269,) the ■court referring to the cases of Kirkpatrick and Dox, say that they established the principle that even in regard to matters ■connected with the cause of action relied on by the United States, the Government is not responsible for the laches, however gross, of its officers.
The only case I have found which would seem to hold any ■other views than those expressed in the cases thus cited, is United States v. Barker, (12 Wheaton, 559,) decided at the same term at which, in Nicholas Case, the court re-affirmed the doctrine laid down in the cases of Kirkpatrick and Yanzandt. The presumption that the court would not be likely to antagonize its decisions at the same term is fully borne out by an examination of the case itself.
The action was by the United States, as indorsee, against Barker, as indorser of certain bills of exchange, and in. the language of the court, the question was “whether notice of the dishonor of the bills was transmitted to the party within the time prescribed by the general law in respect to bills ■of exchange.”
The court, in a very brief opinion, proceeding evidently upon •the ground that the Government, as a holder of a bill of exchange, is bound “by the general law in respect to bills of exchange,” and cannot charge the parties to such paper unless it comply with that law, decided that, because of the neglect to give timely notice to the indorser of the dishonor of the bills, the United States could not recover.
The difference between this case and the others cited is manifest. In them the attempt was to deprive the Government, through the laches of its officers, of a right of action which had, by law, accrued to it. In this case whether any right of action had accrued at all to the Government depended on the general law, and under that law the court held that it had not. The ■difference is clear, and the absence of conflict plain.
In the light of these repeated rulings of the Supreme Court, I am constrained to hold, that the question of due diligence on *344 tbe part of tbe Government in finding and producing’ evidence in cases pending here, is not one to be considerered; for we may not consider a question wbicb we bave not the power to press to all legitimate conclusions, as we could not this. We might find, on the one band, that tbe Government bad used due diligence; but, on tbe other, we could not, without disregarding tbe decisions of tbe court whose decisions govern us, find that it bad not; or, in other words, that it had been guilty of laches.
True, those decisions were given in cases where tbe Government was prosecuting claims against individuals; but will it be questioned that tbe principle they establish is equally applicable to its defenses against the claims of individuals ? Or will it be contended that a principle of such high import may be invoked to control our judgment on the merits, but, upon a motion for anew trial, must yield to a rule of practice? If either is to be so held, then it seems to me the way is clear — a broad and alluring highway, for easy and indetectable collusion between corrupt officials and fraudulent claimants. If this court refuses to consider evidence of “fraud, wrong, or injustice to the United States,” because, in its opinion, due diligence was not used by some Department officer, or agent of the Government, to procure and present the evidence at the trial, is it not in danger of becoming a shield to wrong-doers 1 May it not, by such a course, some time find itself confronted with the maxim, old, at least, as the days of Lord Coke, Idem est f acere, et nolle prohibere cum possis — it is the same to do a thing, as not to prohibit it when in your power ? And can the court justify its inaction by appealing to a common-law rule of practice, not imposed upon it by any statute, but which il has the undoubted right to disregard at will, and which the universal conscience would say it ought to disregard, in favor of justice to the Government that looks to it for protection against “fraud, wrong, and injustice?”
I see no evidence anywhere in the laws of the United States of a purpose to stake the Government’s interests upon such a point. The act in question was passed many years after the Supreme Court had declared the principle of non-imputation of laches to the Government, and it must be considered to have been enacted with reference to that principle. So regarded, it leaves the matter of evidence, in such a ease as this, as entirely *345 free from any question of due diligence or laches, as if the act itself had declared, in terms, that no such question should be raised. And if so, the plain, simple point upon which we are to be “reasonably satisfied” is whether “fraud, wrong, or injustice has been done to the United States.” If we find it has, then I hold it to be our imperative duty to rectify it by granting a new trial 5 and no rule of practice would impede me for a moment in the discharge of that duty. The legislation in regard, to this court clearly indicates to me — as do also the decisions of the Supreme Court — that we are not to be trammeled by technical rules, but are to look into the very right and justice of every case, and suffer no “ fraud, wrong, or injustice to the United States ” to prevail. Howsoever, through whatever instrumentality, from whatever cause it was done, it is, by express law, made our duty to see it undone.
■ This is no more than the simplest fairness and justice toward a Government which, of its own mere motion, unimpelled by any constitutional requirement, creates a tribunal in which itself may be sued by the citizen. And it works no detriment to any honest claimant, through the delay incident to a new trial, which is not far more than compensated by giving him here an appeal from adverse departmental decisions, which would otherwise be final, and saving him from the endless delays, perplexities, disappointments, and ruinous expenses which beset an application to the Congress for relief. He who, by the Government’s own beneficence, is provided with such a recourse against it, cannot justly complain if his case is required, by law, to be untainted with “ fraud, wrong, or injustice,” nor if this court administers the law with fidelity.
I am quite aware that the views thus stated do not coincide with some expressions in the opinion delivered by this court, through me, in the case of Child, Pratt <6 Fox, (6 C. Cls. It., 44,) but that is no reason for their suppression. Upon reconsideration, I am satisfied that in two points — one of doctrine, the other of language — that opinion needs rectification and restatement.
On the first point, that of doctrine, it is now clear to me that the rule in Garrisords Case, (2 C. Gis. B»., 382,) upon a motion by a claimant for a new trial, should not have been applied to such a motion by the Government. The difference between the statutory provisions applicable to the two cases was not there duly *346 considered, nor was the doctrine of non-imputation of laehes to the Government.
The second point is connected with two short sentences in the opinion upon which, severed from the context, great stress has been laid; but which, when fairly examined with the context, are entitled to no such force as is attributed to them. The unguarded use there of the single word laches, in a connection not requiring, nor, indeed, justifying its use, has afforded opportunity for giving- to those sentences, and to the decision, a meaning not authorized by the facts. The sentences referred to are the two concluding ones of the following paragraph:
u But it is claimed that injustice, within the intent and meaning of that section, has been done to the defendants, and that this court is authorized, if not required, for that reason, to grant a new trial. This point, like the others, is connected with the evidence proposed to be introduced to prove the fact of a voluntary submission. Though, as we have shown, that evidence, so far as presented here, would be insufficient to establish that fact, yet we will consider it; and what do we find? Simply that the alleged injustice results solely from the omission of defendants’ counsel to offer at the trial the very evidence now sought to be introduced, though it was as well known to the defendants and their counsel then as now; was then, as now, in their possession; and could as well then have been introduced as it could now be on a new trial. If its non-introduction at the trial was an injustice to the defendants, it was inflicted by their own officers, and not in any measure by the claimants. We Tcnow of no law which would allow a party thus to talce advantage of his own laches. The simple design of this section, as it appears to us, is to protect the Government against unconscionable advantages gained over it, without laehes or mistake on the part of its officers; not to give it unconscionable advantages over claimants through such laches or mistake.”
An examination of this paragraph cannot fail to carry the conviction that the word laches was unguardedly and unadvisedly used there, as applicable to the omission by defendants’ counsel to produce at the trial evidence which was then in their possession. The simple substitution of omission for laches would make those sentences consistent with the previous part of the paragraph, where omission was used, and with the facts of the case; whereas, in their present shape, they are not consistent *347 with either. There was, in fact, no question of laches in that case. Omission is not necessarily laches. Whether so or not, ■depends upon the circumstances under which it takes place. Laches is neglect to do,under given circumstances, what duty required to be then done. There, the defendants’ counsel had in their hands at the time of the trial certain evidence, which, in the exercise of their judgment as counsel, they saw proper to withhold, and afterwards sought a new trial to enable them to produce. No law made it their duty to offer it at the trial; that was left by the defendants to their discretion. In,discussing the subject, the expressions were used to which such great and undue importance has been attached; undue, because the law declared lay not in those sentences, but in a succeeding one, where the point decided was thus finally stated :
“ We do not, therefore, see in this section any authority— much less requirement — to award a new trial to the defendants on the ground of injustice, because at the trial their counsel held back evidence which was equally within their knowledge and their power to produce.”
This was the law declared by the court. The sentences in question were not given as the law of the case, were not at all necessary to the conclusion reached, could have been entirely omitted without affecting the conclusion, and cannot rightfully be regarded as more than the dictum — now seen to have been erroneously expressed — of him who wrote the opinion.
I am gratified at the opportunity of thus indicating the erroneous points in the opinion delivered in that case. Should any others hereafter appear to me, I shall not hesitate to make it known, as occasion may require. Opinionativeness has a low' place in my esteem as a judicial virtue, or as a refuge of truth.
Returning from this digression, 1 proceed to consider the bearing of the only remaining common-law rule urged by claimant’s counsel, viz, that the evidence in support of a motion for a new trial must be newdy discovered.
It is needless to discuss the question whether this is obligatory here as a common-law rule, for, in the case of Child, Pratt & Fox, it was, in effect, deduced from the section in question. We there, held two points: 1. That the evidence relied on must not have been before us at the trial; and 2. That it was not, at the time of the trial, known to the officer representing the defendants here. To these positions I adhere. But it *348 will at once be perceived that they do not meet the requirement of the common-law rule. The difference between the two is in this, that under the common-law rule the evidence must have been newly discovered by the jparty moving for a new trial, but under the statutory rule we required only that it should not have been known to the defendants' counsel at the time of the trial. Upon this difference there is a question of importance, which should be considered.
The Government being a corporate body, an impersonal entity, it can, per se, know nothing, discover nothing. But it must, in some way, know and discover a great multitude of things, and must, when it assumes the character of a litigant, be in some way chargeable with knowledge. In a suit, therefore, between it and an individual; the question arises, Sow is the Government to be charged with knowledge of anything pertaining to the subject-matter of the litigation ? The answer is, only through the officers or agents upon whom, by law, rests the duty of acquiring and using such knowledge. In this court those officers are the Attorney-General and his assistants. What they know the Government knows; what they do not know the Government, pro hoc vice, must be held not to know.
When, therefore, the question is presented whether particular evidence is newly discovered, we have, in my judgment, but one point to determine, and that is, whether it was known to those officers at the time of the trial. If it was not, then, for the purposes of the case, it is as much newly discovered by the Government as if the Government Avere an individual and spoke from and of his individual knowledge. If, on the other hand, it was then known to those officers, the Government is, for the purposes of the case, chargeable with that knowledge.
Is it then, in this case, made to appear that the evidence relied on is newly discovered1? To show this the defendants rely upon the affidavit of Mr. Johnston, who is employed in the Department of Justice, and whose duty it is, in that employment, to defend this suit in this court; and he swears that he “has reason to believe, and does believe, that the evidence was discovered since the trial of this case.”
I admit that this is not such a statement as, under the common-law rule, would be required of an individual; but it is quite vain to attempt to subject the Government here to the same rules, in all things, as in common-law courts are applied *349 to individuals. Its impersonal character makes that impossible. Upon such a motion as this the great question is, whether “ any fraud, wrong, or injustice has been done to the United States1?’ The statute requires us to decide that question “upon such evidence, although the same may he cumulative or other, as shall reasonably satisfy;” and it does riot say hoto it shall be got before us. It is admitted on all hands that those words entirely abrogate the old and well-established common-law rule against granting a new trial upon cumulative evidence. Is it supposáble that a law which thus establishes a new rule, contrary to the common law, as to the character of the evideuce, intends that we shall, as to its admission, stand upon the ceremony of a fit common-law introduction, in default of which the evidence, however conclusive, shall be shut out! I do not read there such an intent. On the contrary, my opinion is, that, no matter how the evidence gets before us, if its existence was, at the trial, unknown to the officers representing the Government here, we are bound to consider it. No statute makes any common-law rule of practice obligatory on this court, with the single exception of those applicable to motions by claimants for new trials. The court, by its amended organic act, u may prescribe rules and regulations for practice therein.” In the absence of an exercise of that authority, the court may, if it please, govern itself by common-law rales of practice; but it may also disregard them, partially or wholly, at its pleasure. On such points, it is, in iapt, with the single exception before stated, its own lawgiver. That was, in effect, established when it was held here, and also in the Supreme Court, that we are not bound by technical rales of pleading; for if we are not bound by technical rules of pleading, how and by what authority are we bound by technical rules of practice i I hold no such rule obligatory when it obstructs the investigation, to every needed extent, of “fraud, wrong, or injustice to the United States.” Therefore, though Mr. Johnston’s statement be not such as would, in a common-law court, be required of an individual, yet I consider it sufficient to authorize us to receive and consider the evidence in support of the motion.
The question, then, comes up, What kind and amount of evidence should be held sufficient, under the section in question, to “ reasonably satisfy the court that fraud, wrong, or injustice has been done to the United States!” This matter has been *350 twice before this court, and should be regarded as settled. In Tait’s Case (5 O. Cls. B., 638) a new trial was granted, on motion of the Government, upon evidence which was considered, prima facie, sufficient to “reasonably satisfy” the court, as indicated in that section. In Ayers’s Case (5 0. Cls. B., 712) the evidence upon which the motion rested was, first, an official bond to the so-called Confederate States of America, given by an assistant quartermaster, in which Ayers was security; and, secondly, a written agreement between Ayers and a rebel captain, on behalf of the Confederate States, to do work in the Macon arsenal. Bo evidence whatever was given tending to prove the execution of either of those papers by Ayers. The claimant objected to their competency or sufficiency as proof, because no such evidence was given; but the court held that the proof was of the kind and character admitted by courts on the hearing of motions for new trial, and that it made out a prima-facie case sufficient for the purposes of the motion, and entitling the Government to a new trial; and in the syllabus of the case is found, what is not in the opinion of the court, this statement: “Hence it is not necessary for the defendants to prove a bond by the subscribing witness, but' to show a reasonable probability that they can prove it on the trial.”
That the doctrine of these decisions is correct, I have no doubt. In requiring only a prima-facie case to be made out by the Government — only a “reasonable probability” that on a new trial the alleged defense can be proved, the court was in the line of meeting the high responsibility devolved upon it, as set forth in the opening part of this opinion. I propose to follow that well-considered lead.
There is one other point of view in which I would set this whole matter.
Intrinsically, and aside from the evidence before us, the claim sued on is either just or unjust.
If it be in reality just, the claimant has nothing to fear from a new trial. Nor can he by any possibility lose his claim if a new trial be granted and he obtain judgment again. All that he would, in that event, lose, would be the use of the money until the new judgment should be paid.
On the other hand, if the claim be in reality unjust, our refusal of a new trial takes from the Treasury $27,715.38, besides interest, which ought not to be taken from it.
*351 When the possible loss through our action is so greatly dis-proportioned between the parties, is it not more consonant with sound principles, with conscience, and with the probabilities of eventual justice, that, even though not as fully satisfied by the evidence as we might desire, we should lean toward protecting the public against so large a loss, rather than toward saving, the claimant from one so small ? A fundamental maxim, probably, in some form, as old as civilized society itself, is, That the law would rather tolerate a private loss than a public evil; and the legislation to which reference has been made is clearly conceived in that spirit. Can we safely disregard both the maxim and the legislation ? Not, in my opinion, without dereliction in duty to the public interests committed to our charge.
Finally, as to the evidence adduced in support of the motion, I do not propose to discuss it. In a dissenting opinion, which can have no controlling force or effect, such a discussion is not demanded. My object has been to state my views of the law. It is sufficient to say that, in my judgment, the evidence makes a prima-facie case, which -“reasonably satisfies” me that “wrong and injustice,” if not fraud, “have been done in the premises to the United States,” and that a new trial ought therefore to be granted.